**William KIDD III, Plaintiff,**

v.

**ILLINOIS STATE POLICE, Defendant.**

**No. 89 C 8504.**

United States District Court,
N.D. Illinois,
Eastern Division.

Feb. 9, 2001.

**1048**

Daniel Hurtado, Jenner & Block, Chicago, IL, for plaintiff.

Paula Giroux, Illinois Attorney General's Office, Chicago, IL, for defendant.

### ORDER

ROSEMOND, United States Magistrate Judge.

This case comes to us on remand from the United States Court of Appeals for the Seventh Circuit, after a bench trial and judgment in favor of Defendant Illinois State Police. The case was remanded to the District Court "so that [it could] address the evidence ... highlighted [by the Court of Appeals]."[1] Additionally, "the court [is][to] look at [certain] evidence afresh on remand."[2] After careful consideration of the evidence at issue, we reach the same conclusion and find in favor of the Illinois State Police.

The Illinois State Police terminated William Kidd III from its employ shortly before he completed his probationary year of training and service as a state trooper. Kidd, who is African–American, filed suit under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a). At the time of his discharge, Kidd was not performing at an acceptable level to become permanently employed as an officer with the Illinois State Police.[3] Nonetheless, in his lawsuit, Kidd charged that his termination was the result of racial discrimination because the Illinois State Police ("State Police") did not afford him remedial assistance comparable to the training and support it provided to a white trooper who had similar writing difficulties. Kidd maintained that to the extent that he was not performing satisfactorily in areas requiring a general functional level of writing skills, such as police reports, his continued spelling, organizational, and grammatical shortcomings were due to the disparate remedial assistance that the State Police had afforded him versus that afforded to Robert Tucker, a white cadet.

■ The remand focuses first upon "[t]he district court's finding that Kidd and Tucker were not similarly situated in terms of their apparent need for remedial

---

1. *Kidd v. Illinois State Police,* 167 F.3d 1084, 1101 (1999).

2. *Id.* at 1102.

3. *Kidd,* 167 F.3d at 1086.

intervention." [4] In reaching this conclusion, the District Court relied considerably upon the testimony of Sergeant DeBerry, who taught report writing to both Tucker and Kidd, and who testified that the problems Kidd displayed in writing at the State Police Academy were much less pronounced than those Tucker had exhibited:

> *Question:* In the overall evaluation of both of these troopers' writings and the problems they had, do you have an opinion as to which one was better or worse?
>
> *Sgt. DeBerry:* Yes, I do.
>
> *Question:* What is that opinion?
>
> *Sgt. DeBerry:* I thought that with Trooper Tucker, there was very little if any hope of him ever writing a police report that would not be embarrassing to the State Police. As regard[s] to Kidd, it was my belief that he needed work but that our field training officers, upon graduation, could help him get to an acceptable performance level in that area.[5]

It should be noted that the District Court did not view Sergeant DeBerry's testimony as suggesting that the prospect of embarrassment was the benchmark against which Sergeant DeBerry judged the need to intervene on a cadet's behalf and provide him with additional tutoring or remedial assistance.[6] In any event, the Court of Appeals ruled that there was objective evidence in the record which stood in significant conflict with the testimony of Sergeant DeBerry.

*The first such category of documentary evidence consisted of writing samples for Kidd and Tucker.* The record contains *only* one first draft writing sample each for Tucker and Kidd. As noted by the Court of Appeals, these writing samples were written by Tucker and Kidd *during their first week at the Academy.*[7]

On or around June 14, 1988, Tucker and Kidd each wrote an essay styled, *"Why I want to be a State Police Officer."* [8] The Court of Appeals recognized that these *sole* first draft writing samples "were not necessarily representative of the entire body of writing that Kidd and Tucker completed at the academy nor of the more focused report writing that Kidd and Tucker would have done in the classroom under [Sergeant] DeBerry's instruction." [9] However, the Court of Appeals ruled that "the elementary types of errors that both cadets made in these essays would ... [likely] also have appeared in the types of reports [that] they prepared for [Sergeant] DeBerry".[10]

Although, as noted by the Court of Appeals, Kidd's and Tucker's first draft of the essay, *"Why I want to be a State Trooper"* contained similarly glaring errors in spelling, grammar, and organization, there were marked differences between the two writing samples. For example, Kidd's essay had the structure of an essay, that is, an introduction, body and conclusion. It is being generous to say that Tucker's essay was written in a stream of consciousness style. It was more of a rambling narrative. There was no form, no structure, no organization, and no prevalent theme to Tucker's essay. Tucker bounced around from one idea to another. Compared to Kidd's essay, Tucker's essay was more difficult to follow.

---

4. *Kidd,* 167 F.3d at 1097.

5. Tr. 174.

6. 167 F.3d at 1100.

7. *Kidd,* 167 F.3d at 1098.

8. Plaintiff's Trial Exhibits, Exhibits 27 and 28.

9. *Kidd,* 167 F.3d at 1100.

10. *Id.*

Even in appearance the two essays were markedly different. Tucker's essay rambled on with no paragraph separation of ideas or themes. Kidd, on the other hand, had distinct paragraphs containing discrete themes. In a general sense, Kidd starts with the past and ends with the future. He begins his essay by speaking about his past, his childhood and what led to his decision to become a state trooper. He then moves to the present and talks about his self-confidence. He then moves to the somewhat complex concept of wanting to make a difference in the world and of helping people to respect the constitutional rights of others. He moves to yet another complex idea, *to-wit:* his future with the State Police and his long-term goals. He talks about how big of an organization the State Police are, and that due to its size he will not experience burn-out and will have flexibility in career choices. Finally, he ends by speaking of the prestige of the Illinois State Police.

Kidd's June 16th essay also spoke to the following complex theme:

> I always knew that a lot of other Police Departments, have problems with [the word used by Kidd here was misspelled but it looks like "unbecoming"] a Police Officer.[11]

The thought that Kidd is endeavoring to articulate is the following, *to-wit:* "I always knew that a lot of other Police Departments have problems with conduct unbecoming to a Police Officer." However, because Kidd's instructor could not decipher the misspelled word "unbecoming" or was otherwise unable to read the word, or understand the gist of what Kidd was endeavoring to say, he placed a bold question mark at the end of the sentence, and instructed Kidd to rewrite the sentence. In-

terestingly, Kidd's June 22d rewrite shows that, on his own, Kidd thought the problem out, resolved it, and wrote the following coherent sentence:

> I always knew that a lot of other Police Departments have problems with rules of conduct.[12]

Kidd's efforts in this regard reveal that he possessed good reasoning, communication, and writing skills and could employ those skills when motivated to do so.

Kidd's original essay reveals that he was making no effort to proofread his work. In his June 16th essay he used the word "enforcement" four times. Twice he spelled it correctly, and twice he spelled it incorrectly—spelling it differently each incorrect time. Had he proofread his essay, he would have caught the errors.

Kidd's essay was markedly more sophisticated in tenor than Tucker's. Kidd used more sophisticated words, such as, "elite", "law enforcement", "organization", "negative", "corruption", and "constitutional rights". He showed the ability to use a sophisticated literary tool, such as the following simile:

> **The Illinois State Troopers are like diamonds in a pool of coals.[13]**

Kidd's essay was more analytical than Tucker's in that Kidd's essay made comparisons and distinctions between different levels of law enforcement. Overall, Kidd's essay was indicative of and reflective of his higher level of education.

We find Kidd's and Tucker's rewrites of their *"Why I want to be a State Police Officer"* essays even more illuminating. The Court of Appeals did not address the rewrites in its opinion. The record contains several rewrites of the essay, *"Why I*

---

11. Plaintiff's Group Exhibit 28.

12. June 22d rewrite.

13. Page 3 of Kidd's June 16, 1988 essay (emphasis added).

*want to be a State Police Officer "*. Tucker and Kidd each submitted original drafts of their essays to their respective instructors. The instructors, in turn, reviewed and critiqued the essays and returned them to the cadets with suggestions and instructions. The cadets were to follow the instructions in rewriting their essays.

Tucker's first draft of his essay *"Why I want to be a State Police Officer "* was submitted on June 14, 1988. He submitted rewrites of the essay on June 15th, June 16th, and June 20th.[14] The June 15th rewrite contained incorrect grammar, incomplete sentences, and a number of misspelled words. Although the June 16th rewrite had shortcomings similar to those found in the June 15th rewrite, they were fewer in number and, therefore, as noted by Tucker's instructor, it was an overall improvement.[15] Several rewrites were submitted on June 20th. They continued to contain numerous misspellings, incorrect grammar and run-on sentences. It is evident from the rewrites that Tucker simply could not spell even the simplest of words. He had sentence completion and word choice problems. Indeed, Tucker's very last June 20th submission (there were three on the same day) still had at least eleven spelling errors, *to-wit:* "suposed"; "tryed"; "aries"; "succeessful"; "explaing"; "sytem"; "mater"; "I've"; "belive"; "Illnois"; and "multy-talented".

Kidd submitted his first draft of his *"Why I want to be a State Trooper "* essay on June 16, 1988. His rewrites were on June 22d, June 27th, July 4th, July 8th, July 13th, and July 14th, 1988.[16] The June 22d rewrite contained incorrect grammar, incomplete sentences and misspellings. The June 27th rewrite was an overall im-

provement. It contained fewer misspellings. However, there were still a number of incomplete sentences and grammatical errors. A major problem with the June 22d rewrite was Kidd's tendency towards repetitiveness.

The July 4th rewrite was a significant improvement over the others. There were fewer misspelled words. Kidd continued, however, to use incomplete and run-on sentences. There were also fewer grammatical errors. Kidd's July 8th rewrite was a major improvement over his prior rewrites. This time he was only asked to rewrite page two of his three-page submission. Kidd's July 13th and July 14th rewrites are rewrites solely of page two of his July 8th rewrite. But for one error, the July 14th rewrite has no misspelled words, no grammatical errors, no incomplete sentences, and no run-on sentences. The sole error is Kidd's use of the plural possessive in the word "persons'", when he should have used the singular or "person's".

Overall, Kidd's rewrites were better than Tucker's. *All* of Tucker's rewrites contained numerous misspellings, incorrect grammar, and incorrect sentence structure. ***Kidd's July 14th rewrite was virtually free of error.*** None of Tucker's rewrites came close to being free of error.

Kidd's rewrites showed a reluctance or stubbornness to follow the instructions of his teachers or to improve himself. For example, in his June 16th essay, Kidd misspelled the word, "personally". The misspelling was brought to his attention, and he was instructed to "look up words in a dictionary if [he][was] unsure of how to spell them." [17] In his June 22d rewrite, he again misspelled the word, "personally",

**14.** Plaintiff's Group Exhibit 27.

**15.** Plaintiff's Group Exhibit 27.

**16.** Plaintiff's Group Exhibit 28.

**17.** Plaintiff's Group Exhibit 28.

which strongly suggests that he took no notice of the advice given to him.

In this regard, we note that Cadet Tucker had somewhat the same problem. He *twice* used the abbreviation "IL" in connection with the phrase "Illinois State Police" after being told not to do so. He also *twice* misspelled the words "tried" and "areas". However, absent from Tucker's work was evidence of a *prolonged refusal* to correct a writing error after being repeatedly told to do so, as in Kidd's case.

Reflective of Kidd's stubborn refusal to heed criticism or to follow instructions is his reluctance to make an effort to correct the following incomplete sentence:

> If you look good, you feel great. I strongly believe in that. *If you take pride in what you do, like the Illinois State Troopers.*[18]

Around June 16th, Kidd was advised that the third sentence quoted above was an incomplete sentence. He was instructed to correct it. He did not follow the instruction. His June 22d rewrite contained the following effort:

> *June 22d rewrite:* If you look good, you feel great. I strongly believe in that. *If you take pride in your work, like the Illinois State Troopers.*[19]

Kidd was advised that the second sentence quoted above remained an incomplete sentence, and was instructed to correct it. Again, he did not do so:

> *June 27th rewrite:* If you look good, you feel great. *I strongly believe that*

if you take pride in your work like the *Illinois State Troopers.*[20]

Again, for the third time, Kidd was advised that the above-quoted sentence was incomplete. And, for the third time, he refused to correct it:

> *July 4th rewrite:* If you look good, you feel great. *I strongly believe that if you take pride in your work like the Illinois State Troopers.*[21]

Again, for the fourth time, Kidd was instructed to correct the above-quoted sentence at issue. And, again, he refused:

> *July 8th rewrite:* If you look good, you feel great. *I strongly believe that if you take pride in your work like the Illinois State Troopers.*[22]

For the *fifth time,* Cadet Kidd was instructed to correct the above-quoted incomplete sentence. For the *fifth time,* he refused:

> *July 13th rewrite:* If you look good, you feel great. *I strongly believe that if you take pride in your work like the Illinois State Troopers.*[23]

Only after having been instructed to do so *six times,* did Kidd correct the incomplete sentence quoted-above:

> *July 14th rewrite:* If you look good, you feel great. *I strongly believe that if you take pride in your work like the Illinois State Troopers, you would understand the word pride.*[24]

As evident from the above-quoted passages, the June 22d, the June 27th, the July 4th, the July 8th, and the July 13th

---

18. Page 2 of the June 16, 1988 first draft of the essay, *"Why I want to be a State Trooper"*, Plaintiff's Exhibit 28 (emphasis added).

19. Page 3 of the June 22d rewrite, Plaintiff's Exhibit 28.

20. Page 2 of the June 27th rewrite, Plaintiff's Exhibit 28 (emphasis added).

21. Page 2 of the July 4th rewrite (emphasis added).

22. Page 2 of the July 8th rewrite Plaintiff's Exhibit 28 (emphasis added).

23. Page 2 of the July 13th rewrite, Plaintiff's Exhibit 28 (emphasis added).

24. The July 14th rewrite (emphasis added).

rewrites are not reflective of *five different endeavors* to correct an incomplete sentence. Rather, they are reflective of *no* effort having been made on *five* different occasions. This stubborn refusal to follow instructions or to seek assistance prevailed, even though Kidd's instructor had told Kidd on or around June 22d, 1988 that, if Kidd needed assistance, all he had to do was ask. As reflected by the instructor's handwritten message to Kidd on the bottom of page one of the June 22d rewrite, remedial assistance was offered to Kidd from the very beginning of his training. The hand-written note read as follows:

— Use complete sentences

— Check your spelling & punc[t]uation

— use the entire sheet

— Work on your penmanship

— *If you are having trouble ask for help.*[25]

Kidd chose not to avail himself of this opportunity.

Indeed, Kidd's refusal on five occasions to correct a sentence that he was fully capable of correcting because he had the ability, knowledge, and writing skills to do so reflects hostility on his part. It reflects his attitude that some of the constructive criticism directed at him was not appropriate, and amounted to no more than the opinion of that instructor:

*Question:* And do you [Kidd] recall Trooper Hines saying: "Trooper Kidd gets excited sometimes during traffic stops and calls in the wrong information, for example, license plates and color of vehicle, and misspells names". Do you recall that?[26]

*Kidd:* That particular day, yes.

*Question:* Okay. So you had knowledge that these sorts of comments were being made about your work; is that right?

*Kidd:* Yes. *It's the person's opinion,* yes.[27]

Apparently, Kidd viewed for five times that the incomplete sentence was merely his instructor's opinion on the matter and simply refused to change it.

Continuing in this vein, we note that after his termination with the Illinois State Police, Kidd sought employment with the Chicago Police Department. The issue of whether or not Kidd had dyslexia came up in connection with Kidd's efforts in this regard.[28] Apparently, after his termination from the Illinois State Police, Kidd never went to a physician to discover whether or not he had such a problem. If Kidd had done so, and discovered that he did not have the disability, he then would have been in a position to brush the issue aside whenever and if ever it arose in the future. For his own benefit and personal satisfaction, one would think that Kidd himself would have wanted to know the truth about the matter. Kidd's conduct in this regard is indicative of his reluctance to pursue the matter with the State Police Academy. This attitude of Kidd's was exactly what Master Sergeant Carter spoke of at the trial:

*Sgt. Carter:* . . . I believe that for a person to correct a problem, they first have to realize [that] they have a problem and . . . take action to correct it. And a probationary trooper who refuses to admit that he has a problem I don't

---

**25.** Plaintiff's Group Exhibit 28 (emphasis added).

**26.** Tr. 77.

**27.** Tr. 77 (emphasis added).

**28.** *See generally,* Tr. 58 and Tr. 59.

believe has a good chance of overcoming that problem.[29]

At trial, neither Kidd nor Tucker's *"Why I want to be a State Police Officer"* essay was ever tendered to Sergeant DeBerry while he was on the witness stand. He was never cross-examined about either writing sample, or any of the rewrites.

As noted by the Court of Appeals, the Illinois State Police trains its troopers in three phases. Phase I is the "cadet" stage, wherein cadets undergo twenty weeks of classroom training at the Illinois State Police Academy in a variety of subjects, including the Illinois Vehicular and Criminal Codes, firearms, first aid, field sobriety testing, and report writing.

Sergeant DeBerry testified that while he was an instructor at the Academy he believed that he "taught report-writing to six out of the ten classes."[30] He testified further that in addition to report writing the "[c]adets were required to write memorand[a] almost on a daily basis to their cadet supervisors as well as within other classes, such as their ... driving-under-the-influence-of-alcohol training [and] ... accident investigation training..."[31] At the same time that Sergeant DeBerry was an instructor at the Academy, he was also a state-wide Field Training Officer Supervisor.[32]

Sergeant DeBerry taught report-writing to Tucker and Kidd.[33] Over the *twenty-week period* that he was either their instructor or supervisory instructor, Sergeant DeBerry saw much more than just *one* written submission by Tucker and Kidd. He was in a position not only to watch their progress, but also their lack of progress. He observed their demeanor, attitude, and receptiveness to criticism. His opinion of Tucker's and Kidd's writing skills was based on his *collective* recollection of their written work gleaned over a twenty-week period, and carried much more weight with the Court than *one* writing sample for each cadet written during their very first week of Academy training.

It must be remembered that initially Sergeant DeBerry did believe that both cadets needed remedial training because both cadets were placed in remedial instruction classes, along with a number of other cadets. In remedial training, the cadets "received assignments that they had to complete at night and turn in to their cadet supervisor. [T]he cadet supervisor would ... evaluate the report, return it for revisions, until ... [the cadets] turned ... in ... acceptable report[s]."[34] *Both Tucker and Kidd "failed ... report-writing and the [Academy's] remedial training."*[35]

It must be remembered that our focus is upon two cadets who were at the *bottom* of their class. It must be remembered that prior to Tucker's graduation from the Academy, and based on Tucker's having failed report-writing and the remedial training related thereto, Sergeant DeBerry recommended that Tucker be terminated. His recommendation was rejected by his superiors.[36] Accordingly, forced by his chain of command to advance Tucker to Phase II of his training, Sergeant DeBerry

---

29. Tr. 263.

30. Tr. 166.

31. Tr. 167.

32. Tr. 165.

33. Tr. 172.

34. Tr. 173.

35. Tr. 173.

36. Tr. 177. He made the same recommendation with respect to Kidd with the same result. Tr. 172 and Tr. 173.

looked to outside help for assistance in improving Tucker's writing skills, and to determine whether there was a learning disability:

> *Question:* Now, at some point, did you ... make a determination that Tucker needed some help with his writing?
>
> *Sgt. DeBerry:* Yes.
>
> &#42; &#42; &#42; &#42; &#42; &#42;
>
> *Sgt. DeBerry:* After reviewing Tucker's writing ... I knew that I did not have the expertise to help him with his report-writing, so I suggested that we seek outside help and also look at his background to see if there was some problem other than just a writing problem.[37]
>
> &#42; &#42; &#42; &#42; &#42; &#42;
>
> *Question:* ... So was Tucker sent for an evaluation of his writing problems while he was still at the Academy?
>
> *Sgt. DeBerry:* Yes.
>
> *Question:* Did you consider sending Kidd ... for an evaluation at that time?
>
> *Sgt. DeBerry:* No.
>
> *Question:* Why was that?
>
> *Sgt. DeBerry:* Whereas [Kidd's] work in report-writing was not to a level to be considered acceptable upon graduation, I still felt that we had enough trainers out in the field that, hopefully, putting him in that environment, we could get him up to speed. But again... Tucker's problem was very obvious that he needed some type of help, that he had a problem.[38]

Thus, as the aforementioned chain of events indicate, it was never a conscious decision on the part of Sergeant DeBerry to give preferential treatment to Tucker.

Rather, Sergeant DeBerry's decision to seek outside help to treat Tucker was dictated by outside forces, *to-wit:* his superiors' decision to override his recommendation to terminate Tucker. It is to Sergeant DeBerry's credit that when confronted with the extreme learning difficulties exhibited by Tucker that DeBerry recognized that he lacked the expertise to deal with the matter, and that outside help was needed.

An instructor of Sergeant DeBerry's experience and knowledge is fully aware that there are some students who do not perform well in a classroom setting, but do excel in a hands-on situation. Phase II of a cadet's training was a hands-on, field training environment. As noted by the Court of Appeals, in this second phase, each trainee (now referred to as a "probationary trooper") participates in active patrol under the accompaniment and supervision of primary and alternate Field Training Officers, typically for a period of ten to fourteen weeks. In this type of setting, DeBerry expected Kidd to observe firsthand the importance of having good report-writing skills.

Moreover, with all his years of experience, Sergeant DeBerry was fully aware that the Phase II field training period tended to be a more warm and nurturing environment for the trainees. As noted by Sergeant DeBerry, "[t]here is a common trait of friendship that happens within a squad car where you're riding with another officer for eight hours a day..."[39]

It must be remembered that Sergeant DeBerry had numerous occasions to not only review and grade Tucker's and Kidd's written work over a significant period of time, but he also had many different op-

---

**37.** Tr. 175 and Tr. 176.

**38.** Tr. 176 and Tr. 177.

**39.** Tr. 187.

portunities to observe Kidd's and Tucker's attitude and demeanor in class. He knew that the two men did not have similarly situated educational backgrounds. Kidd was a college graduate, while Tucker was a high school graduate. In addition, perforce, Sergeant DeBerry was aware of Kidd's reluctance to heed critiques of his written work or to follow instructions meant to improve his writing skills:

> *Question:* ... as far as him [Kidd] having resistance to completing assignments that he was told to do. Did this occur at the Academy?
>
> *Sgt. DeBerry:* Yes, it did.
>
> *Question:* And were these things that you told him he should do, or someone else?
>
> *Sgt. DeBerry:* It was ... my information of my personal knowledge of reports that he was told to rewrite, that he failed to complete revisions on the reports and turn them in.[40]

Thus, Sergeant DeBerry was confronted with two cadets—one white and the other black—who were not similarly situated. The white cadet was a high school graduate who appeared to be functioning very close to his maximum potential as a report writer. The black cadet was a college graduate who was expected to be capable of performing better due to his greater educational background. As reflected by the July 14th rewrite of page two of his *"Why I want to be a State Trooper"* essay, Kidd was fully capable of writing a virtually error free narrative. But, as reflected by his June 22d, June 27th, July 4th, July 8th, and July 13th, 1988 rewrites of that essay, he had a stubborn propensity not to

follow instructions from superiors designed to improve his writing skills.[41] And, even though one of his writing instructors made it quite clear that, if he wanted help, the instructor would give it to him, there is no evidence that Kidd availed himself of that assistance. Thus, from Sergeant DeBerry's perspective, as well as that of the other instructors, Kidd had the ability to do better, but simply was not motivated to do so.

Finally, it must be noted that it is not evident from Kidd's *"Why I want to be a State Trooper"* essay and the rewrites thereto that Kidd had a left-to-right confusion or problem transposing numbers. In the Phase II field training stage, the Field Training Officers riding in squad cars with Probationary Trooper Kidd noticed that he was transposing numbers. For example, telephone number 226–3882 was written by Kidd as 226–8382; license plate number IV7668 was written by Kidd as IV6768; and 87 Honda was written as 85 Honda.[42] In connection with a motorist assist situation, the following incident occurred during Kidd's probationary field training:

> On the ... Motorist Assist, [Trooper] Kidd called out the registration as SBX 520, double-phrasing it. The registration was in fact SBX 250. When [Trooper] Kidd returned to the squad car, I [Field Training Officer Weitzel] asked him to repeat the registration to me. He stated that it was SBX 520. When I asked for clarification on the numbers, he again stated 520. Finally, when I said "Are you sure?", he got the numbers correct. After this, we were again given a motorist assist.[43]

---

**40.** Tr. 180 and Tr. 181.

**41.** *See generally, Kidd v. Illinois,* 1997 WL 361140, at *8 (N.D.Ill. June 20, 1997) (Magistrate Judge Rosemond).

**42.** Defendant's Exhibit K.

**43.** March 3, 1989 *Daily Narrative* (Week No. 18 of Phase II training), Defendant's Group Exhibit B, at B–29.

This type of number confusion could only be discovered by comparing Kidd's written submissions to the actual license plates themselves or by comparing his reports with the memory of the State Trooper riding in the squad car with Kidd who also saw the same license plate configurations or numbers themselves. The disorder or disability would not be self-evident from essay writing. This fact buttresses Sergeant DeBerry's testimony that Kidd's problems in this area did not surface until the Phase II training stage when Kidd was required to read the numbers and letters on license plates.[44]

*The next category of documents* ruled by the Court of Appeals to be in significant contrast to Sergeant DeBerry's testimony are the performance ratings that Kidd and Tucker received in their writing classes. As noted by the Court of Appeals, the marks that Kidd and Tucker received in writing at the Academy suggested that the two were performing comparably.

In light of the record as a whole, including the testimony of Sergeant DeBerry, the performance ratings do not show that the two cadets were performing comparably *to the best of their ability.* Sergeant DeBerry testified that Cadet Kidd had a propensity for not completing revisions of his writing assignments and of not following instructions designed to improve his writing skills. Accordingly, the fact that the two cadets were performing comparably is not definitive. *The reasons why they were performing comparably is important.* Tucker was very close to being illiterate. There was not much room for improvement with him. The State Police hoped that he would be able to at least achieve a minimal level of performance acceptability.

Kidd, on the other hand, was not perceived by his instructors as performing anywhere near his potential. He was perceived as simply not trying hard enough. He refused to follow instructions. He did not like criticism. He simply was not motivated to do better.

The Court was provided no basis for discarding Sergeant DeBerry's entire opinion, even assuming, for the sake of argument, that his recollection of Tucker's and Kidd's test scores was not completely accurate. As noted earlier, the gist of DeBerry's testimony included his observations and impressions of Kidd's and Tucker's capabilities. In DeBerry's opinion, Tucker had a problem with basic sentence structure, grammar, and spelling, which DeBerry believed could be improved *through tutoring.* This was his judgment call and his impression. There's no indication that it was made with any racial bias towards Kidd. It was his impression that Tucker was doing the best he could and could not do too much better.

However, with respect to Kidd, it was DeBerry's impression that Kidd was not trying hard enough; that Kidd could do better, but lacked the motivation to do so. Kidd was not in need of tutoring. He was in need of inspiration. DeBerry made a judgment call which may or may not have been correct, but there is clearly no showing that it was a judgment call made with any racial animus towards Kidd. Therefore, the fact that Tucker scored the same or higher on some test scores is no basis for discarding DeBerry's entire testimony.

The two cadets had comparable grades, but they were not comparable in any other respect. Again, as noted earlier, Tucker could not do much better than he was

---

**44.** Our previous opinion outlines the serious dangers that could result from an officer transposing numbers and letters. *See general-* *ly, Kidd,* 1997 WL 361140 at *7; *see also* Tr. 188, 250, and 251.

doing. Kidd could—as evidenced by his rewrites. He simply chose not to.

[2] *Finally, the Court of Appeals directed the District Court to re-examine the statistical evidence presented by Kidd at the trial, and to permit the parties to submit additional such evidence if they so desired.* Upon remand, Kidd filed a *Motion for Leave to File Proposed Supplemental Findings.* The motion was granted on March 30, 2000.[45] The supplemental submissions from Kidd consisted of *Proposed Supplemental Findings and Supporting Memorandum;* the *Declaration of Barry R. Chiswick, Ph.D.;* Dr. Chiswick's qualifications; statistics detailing resignations and terminations of Illinois State Troopers by cadet class; and a probability distribution table.

In its opposition to Kidd's motion, the State Police challenged Kidd's submission of an affidavit from an expert who had not been named during discovery and had not been subject to cross-examination. We summarily overrule the State's objection. The State Police were given ample opportunity to re-open discovery to depose anyone they so desired, including Kidd's expert, Dr. Chiswick. They chose not to do so. The State Police were given the opportunity to obtain a rebuttal expert. Again, they chose not to do so.

*The statistical evidence regarding racially discriminatory discharges does not support a finding that Kidd suffered disparate treatment.* The statistical evidence was offered by Kidd as evidence that the State Police's proffered justification was not the true reason Kidd was terminated.

*The weight to be given to the statistics:* Statistics have "relatively low importance in an individual disparate treatment case."[46] Statistics should not be used as the primary means of establishing discrimination, but can be used in conjunction with other evidence of discrimination.[47] "The usefulness of statistics in an individual treatment case to show pretext 'depends on all the surrounding facts and circumstances.' "[48]

Plaintiff's Exhibit 21 was admitted into evidence at trial. Exhibit 21 contains statistical data for State Police Academy, Cadet Class, Nos. 70–88. Kidd was in Cadet Class No. 83, which went from June 12, 1988 through October 28, 1988.[49]

For each of the numbered classes, the data includes the name, race and gender of each cadet who either was terminated, resigned, or otherwise was separated from the State Police during the training period. For Cadet Class Nos. 80–88, the data further includes the total number of cadets

**45.** *Minute Order,* March 30, 2000 (Docket Entry No. 174).

**46.** *Gilty v. Village of Oak Park,* 919 F.2d 1247, 1253 n. 8 (7th Cir.1990) (*citing* B. Schlei & P. Grossman, EMPLOYMENT DISCRIMINATION LAW 15 (2d ed.1983)); *see also Kidd,* 167 F.3d at 1102 n. 16.

**47.** *Bell v. Environmental Prot. Agency,* 232 F.3d 546, 552–53 (7th Cir.2000), *citing, Kidd,* 167 F.3d at 1101 n. 16 (7th Cir.1999) (*citing McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 805, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973)).

**48.** *Bell,* at 232 F.3d at 553 (*citing International Bhd. of Teamsters v. United States,* 431 U.S. 324, 340, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977)).

**49.** Phase II field training for Kidd would have ended on or around February 1, 1989, but for the decision of the Phase II Board of Review to retain him in Phase II for additional training. Defendant's Exhibit E. Phase III ended for Kidd around May of 1989. Thereafter, he was advanced to permanent state trooper status effective June 12, 1989. Defendant's Exhibit X. He was terminated around June 9, 1989.

entering each Cadet Class, broken down by race and gender.

The chart below shows the number of white cadets and the number of African–American cadets who started in Cadet Class Nos. 80–88, based on Exhibit 21:

| Class Number | White Starting Cadets | African–American Starting Cadets |
|---|---|---|
| 80 | 66 | 17 |
| 81 | 42 | 9 |
| 82 | 54 | 10 |
| 83 | 73 | 22 |
| 84 | 35 | 12 |
| 85 | 36 | 13 |
| 86 | 37 | 15 |
| 87 | 50 | 2 |
| 88 | 47 | 3 |
| TOTAL | 440 | 103 |

The next chart shows the number of white cadets and African–American cadets, respectively, who were terminated from each of Cadet Class Nos. 80–88, based on Exhibit 21:

| Class Number | White Terminated Cadets | African–American Terminated Cadets |
|---|---|---|
| 80 | 1 | 2 |
| 81 | 2 | 3 |
| 82 | 0 | 1 |
| 83 | 1 | 10 |
| 84 | 1 | 0 |
| 85 | 2 | 2 |
| 86 | 2 | 6 |
| 87 | 1 | 1 |
| 88 | 1 | 1 |
| TOTAL | 11 | 26 |

To be statistically meaningful, the raw numbers of terminations, 11 whites and 26 African–Americans, must be compared to the respective numbers of whites and African–Americans who started Cadet Class Nos. 80–88 to determine the rates at which white cadets and African–American cadets were terminated. In other words, to determine the rate at which an event occurs, it is necessary to know how many opportunities there were for the event to occur. To illustrate, if one were seeking to determine the rate at which the State Police hired African–Americans, then the number of African–Americans hired would be compared to the number of African–Americans in the relevant applicant pool or labor market. Or, if one were seeking to determine the rate at which the State Police promoted African–American troopers to the rank of Sergeant, then the number of African–American troopers promoted to the rank of Sergeant would be compared to the number of African–American troopers in the State Police workforce eligible to be promoted.

For purposes of Kidd's case, the rate at which African–Americans were terminated is calculated by comparing the number of African–American terminations (the event) to the number of African–Americans starting as cadets (the opportunities for the event). The rate at which whites were terminated is calculated by comparing the number of white terminations to the number of whites starting as cadets. Using this formula, the termination rate for African–American cadets is $26 \div 103 = 0.2524$ or approximately 25%. In other words, one out of every four African–Americans was terminated from the State Police training program.

The termination rate for white cadets is $11 \div 440 = 0.0250$ or exactly 2.5%. In other words, one out of every 40 whites was terminated from the State Police training program. Put still another way, African–Americans were terminated at a rate 10 times higher than the rate at which whites were terminated. Even without expert analysis, a comparison of the termination rates shows striking differences.

The above-noted information was analyzed by Kidd's expert witness, Dr. Chiswick, a professor specializing in Economics, Statistics, and Applied Econometrics. Dr. Chiswick utilized statistical analysis to determine whether the difference between the termination and separation rates of African–American officers versus white officers could be due to chance.

Dr. Chiswick analyzed the racial makeup of Cadet Class Nos. 80–88.[50] In doing so, he compared the racial makeup of the cadet classes with the subgroup of terminated[51] cadets. His statistical analysis reveals a high standard deviation number. From this number, he concludes that the differential in the respective termination rates could not be due to chance. The standard deviation calculated by Dr. Chiswick is 5.24.[52] Precedential case law supports the proposition that a standard deviation greater than two or three shows that chance should be conclusively ruled out as the cause of the disparity.[53]

Dr. Chiswick's analysis is statistical only. It does not address whether legitimate reasons existed to explain the high discharge rates of African–American cadets. We do not know anything about the discharged African–American cadets, including crucial factors such as their test scores, field performance ratings, their incoming education level, their previous law enforcement experience, or even specific details about the reasons for discharge.

The reason for the statistical disparity could be active institution-wide discrimination by the State Police. On the other hand, some or all of the African–Americans terminated may have been terminated because they lacked the ability to function effectively as troopers. The terminations could be the result of the State Police's failure to recruit well-qualified African–American trooper candidates. We do not know. The statistics do not tell us which of the discharged cadets and probationary troopers were qualified to become permanent troopers.[54]

If any of the African–American terminations had performance deficiencies like Kidd or Tucker, termination was probably necessary to protect the safety of the public. It is certainly possible that the State Police discriminated against African–American officers as a whole. However, our analysis of the record clearly shows that that was not the case with respect to Kidd.

Guiding case law requires that we consider the facts and circumstances surrounding the statistics. The surrounding facts and circumstances do not support a finding of discrimination. Even with the supplemental submissions, the record, as a whole, does not support a finding of discrimination. Although the statistics demonstrate that African–American probationary officers are being terminated at high rates and that there is a statistical significance that shows that the rate differentials are probably not due to chance, this does not change the fact that (1) Kidd was not qualified; and (2) despite his serious shortcomings, the State Police still gave Kidd numerous opportunities, special treatment[55] and even "second chances" to

---

**50.** Racial data for the entering class of cadets was not available for classes before class 80.

**51.** Dr. Chiswick analyzed the statistics for both terminations and separations. Separations included resignations and leaves of absence. We have focused on Dr. Chiswick's figures for terminations. *See Ibarra v. Martin,* 143 F.3d 286, 292 (7th Cir.1998) (suggesting resignations should be excluded in calculations). However, both terminations and separations of African–American Cadets show a high standard deviation number.

**52.** *Declaration of Barry R. Chiswick, Ph.D.,* at 6.

**53.** *Lilly v. Harris–Teeter Supermarket,* 720 F.2d 326, 336 (4th Cir.1983), *cert. denied,* 466 U.S. 951, 104 S.Ct. 2154, 80 L.Ed.2d 539 (1984).

**54.** *See Ibarra,* 143 F.3d 286, 291 (suggesting record supplementing statistics should indicate which members of the protected class were qualified).

**55.** An example of special treatment is that DeBerry begrudgingly offered to extend the

become an officer. We need not draw a tenuous inference from the statistics regarding whether or not Kidd was discriminated against because the facts in the record clearly show that he was not.

In Phase I, Sergeant DeBerry treated Kidd and Tucker comparably, *i.e.*, he wanted them both fired. In Phase II and Phase III, both Sergeant DeBerry and Master Sergeant Carter voted for Kidd's continued advancement, even though they had considerable reservations concerning his ability to perform, until he was eventually advanced to permanent state trooper status.[56] Had they wished to discriminate against Kidd, they would not have continually advanced him, or expended considerable manpower and monetary resources to provide him with additional Phase II training.

It should be remembered that the remedial assistance provided by the State Police to cadet Tucker was tutoring. Sergeant DeBerry and Kidd's other instructors perceived Kidd as not being in need of tutoring, but rather motivation—motivation to follow through on his rewrite assignments, and motivation to follow instructions designed to help him improve his report writing. They also believed that he needed a change of attitude. He needed to be more receptive to constructive criticism.

Most importantly, even if Kidd had received tutoring, his left-to-right confusion, his problem with transposing of numbers, and his radio communication and transmission problems would still not have been discovered until Phase II when Kidd was placed in the field. The primary reasons for Kidd's termination was his inability to relay radio transmissions accurately and to transcribe license plate numbers, license registration numbers, telephone numbers, and similar numerical data correctly. As we have noted earlier, such problems are not evident from his *"Why I want to be a State Trooper"* essay or the rewrites thereto. And, we were never given any evidence suggesting that it should have been evident.

As we noted before, Kidd's left-to-right confusion, his problem of transposing numbers, and his radio transmission difficulties were not matters that could be diagnosed or discovered by his Academy writing assignments. Kidd's problems in this regard became evident in Phase II where his fellow officers, viewing the same license plates that Kidd observed, noticed that he failed to transcribe them correctly.

We are constrained to again conclude that Kidd repeatedly showed that he lacked the ability to perform basic functions necessary for a state police officer. The fact that other African–American probationary troopers were being terminated in high percentages, alone, or in conjunction with the other evidence in this case, does not provide Kidd with a valid discrimination claim. Neither Kidd nor the State Police advised the Court of the number of African–Americans who were advanced from Phase III probationary training to permanent state trooper status.

*Accordingly, it is adjudged, decreed, and ordered as follows:*

1. The June 14, 1988 draft of Probationary Trooper Robert Tucker's essay, *"Why I want to be a State Trooper"* and

---

rules regarding probationary status in favor of Kidd. Tr. at 194.

**56.** Initially, Probationary Trooper Kidd was not passed from Phase II to Phase III because he was not performing satisfactorily. Tr. 256.

Accordingly, he was retained in Phase II for an extended period of time for *additional* training—longer than any other probationary trooper—before being passed on to Phase III. Tr. 256 and Tr. 257; Defendant's Exhibit E.

the June 16, 1988 draft of State Trooper William Kidd III's *"Why I want to be a State Trooper"* essay do not discredit the testimony of Sergeant DeBerry whose testimony regarding Tucker's and Kidd's writing skills was based on his observations of the two men over a twenty-week time period during which he reviewed many different writing samples of the two men and also observed their attitude and their efforts to improve.

2. Kidd's and Tucker's *"Why I want to be a State Trooper"* essays and rewrites support Sergeant DeBerry's observations that Kidd was not trying hard enough.

3. Kidd's and Tucker's *"Why I want to be a State Trooper"* rewrites support Sergeant DeBerry's testimony that Kidd was reluctant to follow instructions designed to improve his writing skills.

4. The fact that documentary evidence shows that the two received similar ratings or grades regarding their class assignments does not take into account the fact that only Tucker appeared to be performing close to full capability. This was the perception of Sergeant DeBerry and Kidd's other instructors, and is borne out by Kidd's rewrites.

5. It is clear from the drafts of Kidd's and Tucker's essays of *"Why I want to be a State Trooper"* and the rewrites thereto that Sergeant DeBerry and the other Academy instructors would not have been able to detect a left-to-right confusion or problem with transposing of numbers and letters from the writing assignments of Kidd and Tucker.

6. Statistical evidence is of relatively little importance in an individual disparate treatment action. At best, it may show that the State Police discriminated against African–American cadets and probationary troopers in other situations, but it does not show that it necessarily happened in Kidd's case. In the fact-specific case before this Court, the record shows that the State Police did not discriminate against William Kidd III.

*So Ordered.*